**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KALMBACH FEEDS, INC.,** | : | |
| | : | **Case No. 2:25-cv-00617** |
| **Plaintiff,** | : | |
| | : | **Judge Algenon L. Marbley** |
| **v.** | : | |
| | : | **Magistrate Judge Vascura** |
| **PURINA ANIMAL NUTRITION,** | : | |
| **LLC,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |

## OPINION AND ORDER

This matter comes before the Court on Plaintiff Kalmbach Feeds, Inc.'s motion for a Preliminary Injunction against Defendants Purina Animal Nutrition, LLC and five unnamed John Does. (ECF No. 8). Plaintiff seeks to enjoin Defendants from making certain representations about its animal feed products under the Lanham Act and the Ohio Deceptive Trade Practices Act, and also seeks a retraction notice. (ECF No. 26 at 2). For the following reasons, this Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for a preliminary injunction.

### I.  BACKGROUND

#### A.  Factual Background

Plaintiff Kalmbach Feeds and Defendant Purina Animal Nutrition are competitors in feed products for a variety of animals, including poultry. (ECF Nos. 66 at 1; 67 at 1). Kalmbach developed a poultry feed product called "Henhouse Reserve" in 2019 aimed at the "backyard"

poultry market. (Tr. vol. 1,[1] 48–49). Purina launched a competitive product called "Farm to Flock" in April 2025. (ECF No. 66 at 1; *see* Tr. vol. 1, 50).

Henhouse Reserve and Farm to Flock appear similar. Both feeds have a "granola-like" texture and form. Both are characterized as "premium" feeds aimed at the owners of backyard chicken flocks, specifically for their egg-laying hens. (ECF No. 66 at 2–3; ECF No. 67 at 2–3). Backyard chicken flock owners tend to have fewer chickens; they may treat their chickens more like pets and pay for premium feed. Aside from the obvious economic motivations shared with all owners of livestock, backyard owners may also be more emotionally motivated to keep their chickens alive, because they might keep their chickens as a hobby, for eco-conscious reasons, or because they view them as their pets. Thus, they may be particularly concerned about recent avian influenza outbreaks. (Tr. vol. 3, 353–54, 362, 364).

Avian influenza, or H5N1, is the disease of concern in poultry. Commonly known as "bird flu," certain strains can become extremely contagious and deadly. These strains are referred to as highly pathogenic avian influenza. (ECF No. 67 at 6–7). Highly pathogenic avian influenza broke out in the United States in 2022, decimating poultry flocks and leading to soaring egg prices. (*Id.* at 7–8).[2]

---

[1] The hearing began on August 26, 2025, and the transcript from the first day of the hearing is denoted as Volume 1. (ECF No. 57). The hearing continued through August 27, 28, and September 8, and the transcripts from those dates are denoted as Volumes 2, 3, and 4, respectively. (*See* ECF Nos. 58–60). All hearing transcripts are cited to as "Tr. vol."

[2] Julie Creswell, *Egg Prices Are High. They Will Likely Go Higher*, N.Y. Times (Jan. 24, 2025), available at https://www.nytimes.com/2025/01/24/business/egg-shortage-prices.html ("Volatile egg prices have been a part of the grocery shopping experience partly because of inflation, but also because of an avian influenza, or bird flu, that made its way to the United States in 2022. That influenza, caused by the H5N1 virus, has infected or killed 136 million birds thus far."); *see* Jaewon Kang & Patrick Thomas, *Egg Prices Surge to Records as Bird Flu Hits Poultry Flocks*, Wall St. J. (Dec. 22, 2022), available at https://www.wsj.com/articles/egg-prices-surge-to-records-as-bird-flu-decimates-poultry-flocks-11671689775.

Farm to Flock offers one crucial difference from Henhouse Reserve in this regard. Farm to Flock contains "FeedLock," which Purina describes as a "multispecies feed additive technology" which has been included in feed sold to commercial cattle, swine, and poultry consumers for some time. (ECF No. 66 at 5). FeedLock consists of medium-chain fatty acids which are designed to interact with the membranes of envelope viruses and "deactivate" them. (*Id.*). The development of FeedLock began in 2015, following outbreaks of disease in American swine. (Tr. vol. 4, 605). Although medium-chain fatty acids have been found to help prevent outbreaks of disease in swine, to date, there is no evidence that they impact disease outbreaks in poultry. (*See* ECF Nos. 66 at 7–8; 67 at 9). Ostensibly, FeedLock could allay a backyard owner's fears of avian influenza—which otherwise looms large in the United States, threatening death to "all [of a backyard owner's] pretty chickens . . . [in] one fell swoop." William Shakespeare, *Macbeth* act 4, sc. 3, ls. 2099–2102.

From April 14, 2025 until sometime around the end of May, Purina actively marketed Farm to Flock as "helping to defend against bird flu." (ECF No. 66 at 3). Purina based its claim on a laboratory test and an assumption. First, Purina and its codeveloper of FeedLock tested FeedLock on chicken feed, dosing four samples of feed with varying levels of FeedLock and H5N1, and one sample of control feed with H5N1 only. They determined that the FeedLock feed "showed reduced viral loads" after twelve hours, while the control sample showed stable levels of bird flu for a week. (*Id.* at 6–7). Second, Purina made a critical assumption. Based on the "consensus in the swine industry," stemming from a commercial swine study, that medium-chain fatty acids "inhibited the transmission of [swine envelope virus] pathogens in the feed to" swine, Purina extrapolated that the medium-chain fatty acids in FeedLock would similarly inhibit the transmission of the avian influenza envelope virus pathogens to poultry. (*Id.* at 8).

3

Purina directly advertised its Farm to Flock bird flu defense claims on its website and social media platforms, as well as through direct communications to consumers and distributors across the United States.  (ECF Nos. 66 at 12; 67 at 11–12).  Its employees, including scientists and sales representatives, repeated variations of these claims on webinars and at in-person industry meetings.  In describing the purported flu-fighting properties of Farm to Flock, Purina's employees sometimes claimed it "has been shown to be protective against, protecting against viruses . . . includ[ing] bird flu."  (Pl.'s Ex. 11-D; *accord* Pl.'s Ex. 1-H).[3]  Moreover, consumers, third-party distributors, and influencers amplified Purina's messaging, sometimes confusing it.  (*See, e.g.*, ECF No. 67 at 12; Pl.'s Exs. 11-B–11-Q, 12-A; Tr. vol. 2, 276–77 (suggesting distributor confusion)).

State and federal regulators quickly noticed Purina's claims.  In May, regulators in Kansas and Minnesota raised concerns that the claims implied FeedLock "may be used to treat or prevent disease."  (Pl.'s Ex. 4-D; Pl.'s Ex. 4-B).  Purina removed its claims at the end of May and beginning of June, and began monitoring and requesting that similar claims made by third parties be taken down.  (ECF No. 66 at 28).  In early July, the United States Food and Drug Administration identified an additional statement that Purina needed to edit or remove. (Tr. vol. 4, 611–12, 636).

Kalmbach also noticed and brought this lawsuit, fearing that backyard consumers would purchase Purina's feed over Kalmbach's in the hopes that Farm to Flock would protect their birds from avian influenza.  (*See* Tr. vol. 1, 70–74).  Now, Kalmbach and Purina's feed fight finds its way into the court system.

---

[3] Video available at:  Reiterman Feed & Supply, *Virtual Flock Talk*, at 18:36 (May 13, 2025) (https://thevanleuvenco.s3.us-east-1.amazonaws.com/Reiterman+Flock+Event+2025.mp4).

## B. Procedural Background

Kalmbach filed its Complaint (ECF No. 1) on June 3, 2025, and moved for a preliminary injunction on June 4. (ECF No. 8). Without admitting liability, Defendant Purina consented to the preliminary injunction motion on June 18, proposing that this Court enjoin "Defendant, its officers, agents, and employees . . . from engaging in disseminating any advertising or promotional materials that claim, explicitly or implicitly, that Defendant's products defend against or help defend against avian influenza [] pending final resolution of this action" and require Purina to remove such advertising and promotional materials from its website, social media, and digital platforms under its control, as well as notify its distributors, retailers, and marketing affiliates to cease use or dissemination. (ECF No. 24-1 at 1). Kalmbach objected on June 20, characterizing Purina's proposed injunction as a "half remedy," and requesting this Court order Purina to issue a "retraction, advising of the false statements." (ECF No. 25 at 2). Likely realizing that its Complaint and Preliminary Injunction Motion did not request a retraction in the first instance, Kalmbach amended its motion "[a]s to the scope of the remedy" on June 23, formally requesting "a retraction notice in addition to an injunction against further false advertisements." (ECF No. 26 at 1–2). Purina opposed that same day, characterizing the amendment as "mov[ing] the goal posts." (ECF No. 27 at 1).

On June 25, 2025, Purina filed its opposition to the preliminary injunction (ECF No. 28) and moved to dismiss the Complaint (ECF No. 29). On July 4, 2025, Kalmbach filed its reply in support of its Preliminary Injunction Motion. (ECF No. 34). Kalmbach opposed the Motion to Dismiss on July 16 (ECF No. 40), and Purina replied on July 30. (ECF No. 43). This Court heard argument on the preliminary injunction on August 26–28 and September 8, (*see* ECF Nos. 57–60),

and the parties submitted final briefing regarding it on September 29 and October 6. (ECF Nos. 66–69). This Court considers the motion for a preliminary injunction.

## II.    STANDARD OF REVIEW

Federal courts may issue preliminary injunctive relief upon notice to the adverse party when a party believes it will suffer from immediate and irreparable injury. *See* Fed. R. Civ. P. 65(a). A preliminary injunction is an "extraordinary remedy," intended to preserve the status quo until trial. *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). It "should 'only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Winter*, 555 U.S. at 22).

The Court considers four factors "to be balanced" in evaluating whether to issue a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *S. Glazer's Distribs.*, 860 F.3d at 849 (citation and internal quotation marks omitted). These factors are not prerequisites, but if there is no chance of success on the merits, an injunction cannot issue. *See id.*

## III.    LAW & ANALYSIS

The Court's evaluation of Plaintiff's claims under the federal Lanham Act and the Ohio Deceptive Trade Practices Act, and the nature of Defendants' challenged statements, is central in determining whether a preliminary injunction can issue. As explained below, Plaintiff is likely to succeed on the merits of its false advertising claims.

## A. Causes of Action

Both the Lanham Act and the Ohio Deceptive Trade Practices Act prohibit what is commonly referred to as "false advertising." The Lanham Act establishes liability for the use of "any word, term, . . . or any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities[] . . . of [its] or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). Ohio's Deceptive Trade Practices Act also prohibits deceptive trade practices. *See* Ohio Rev. Code § 4165.02(A). Under Ohio's law, it is a violation to "[r]epresent[] that goods . . . have . . . characteristics, ingredients, uses, benefits, or quantities that they do not have." *Id.* at § 4165.02(A)(7). Under either law, any party alleging injury can bring suit for a preliminary injunction. *See Lewis v. Acuity Real Estate Servs., LLC*, 63 F.4th 1114, 1117 (6th Cir. 2023); Ohio Rev. Code § 4165.03(A).

To establish a false advertising claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), a party must prove: (1) the adverse party "made a false or misleading statement of fact about [another person's] product or service"; (2) that statement "actually deceived or tended to deceive a substantial portion of the . . . intended audience"; (3) that statement "likely influenced the intended audience's purchasing decisions"; (4) the adverse party "introduced the statement in interstate commerce"; and (5) "a causal connection" exists between the statement and injury. *FedEx Ground Package Sys., Inc. v. Route Consultant, Inc.*, 97 F.4th 444, 452–53 (6th Cir. 2024); *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 798 (6th Cir. 2015).

Ohio's Deceptive Trade Practices law is analogous to the Lanham Act. It does not have the interstate commerce component of federal law, but otherwise, a party establishing a false advertising claim under it must establish: (1) "a false [or misleading] statement"; (2) that statement

7

"actually deceived or has the tendency to deceive a substantial segment of the target audience"; (3) that deception "is material" such that "it is likely to influence a purchasing decision"; and (4) the party bringing the claim "has been or is likely to be injured as a result." *Kinzie Advanced Polymers, LLC v. Calyx Containers, LLC*, 2025 WL 2903642, at *10 (N.D. Ohio Sept. 17, 2025) (citing *Torrance v. Rom*, 157 N.E.3d 172, 188 (Ohio Ct. App. 8th Dist. 2020)).

Courts typically use the same analysis when evaluating false advertising claims under both the Ohio Deceptive Trade Practices Act and the Lanham Act. *Scotts Co. v. SBM Life Science Corp.*, 749 F. Supp. 3d 865, 881 (S.D. Ohio 2024); *see also Clark v. Walt Disney Co.*, 642 F. Supp. 2d 775, 784–85 (S.D. Ohio 2009) (describing the laws as "substantially similar"); *The Hillman Grp., Inc. v. Minute Key Inc.*, 317 F. Supp.3d 961, 968 (S.D. Ohio 2018) (noting that claims under each law "rise or fall together"); *Stilson & Assocs., Inc. v. Stilson Consulting Grp., LLC*, 129 F. App'x 993, 994 (6th Cir. 2005) (similar). Thus, this Court's analysis follows the Lanham Act's elements in the first instance, noting that Ohio law does not require the interstate commerce element.

### B. Likelihood of Success on the Merits

This Court considers whether Kalmbach is likely to succeed on the merits of its claim that Purina's statements constitute false advertisement in violation of the Lanham Act, and thus, also in violation of the Ohio Deceptive Trade Practices Act (*see* Section III(A), *supra*). *S. Glazer's Distribs.*, 860 F.3d at 849. As mentioned, the elements of the Lanham Act violation are whether the statements: (1) were false or misleading statements of fact; (2) actually deceived or tended to deceive a substantial portion of the intended audience; (3) likely influenced the intended audience's purchasing decisions; (4) were introduced into interstate commerce (as relevant *only* to the Lanham Act claim); and whether (5) there is a causal connection between the statements and

Plaintiff's injury. *FedEx*, 97 F.4th at 452–53. The Court makes the following findings for the purpose of granting a preliminary injunction.

### 1. False or Misleading Statement of Fact

First, Kalmbach must show either a false or misleading statement of fact. *FedEx*, 97 F.4th at 452–53. The statement must be capable of being proved false or being reasonably interpreted as a statement of objective fact to be actionable. Statements of opinion, puffery, or hyperbole alone are generally insufficient, although "a statement's context can transform it from 'unactionable' to 'an empirically verifiable, factual claim.'" *FedEx*, 97 F.4th at 453 (citation omitted).

Plaintiff can sue for false advertising and recover for literally false or misleading statements. A literally false statement conveys "an unambiguously deceptive meaning" and is "bald-faced, egregious, undeniable." *Id.* (citations and internal quotations omitted). A statement is *not* literally false when it "reasonably conveys different messages." *Id.* Crucially, courts "presume that a literally false statement deceived its intended audience," and therefore, this is the preferred route for Lanham Act claimants. *Id.* (citations and internal quotations omitted).

By contrast, misleading statements are "literally true, yet deceptive, or too ambiguous to support a finding of literal falsity." *Id.* at 454 (citations and brackets omitted). Unlike literally false statements, where deception is presumed, here Plaintiff "must demonstrate that a significant portion of reasonable consumers were *actually* deceived by the defendant's messaging." *Id.* (citations and internal quotation marks omitted). Often, this is demonstrated by consumer surveys, but in the absence of surveys—for instance, when evaluating a motion to dismiss—courts can consider "whether the facts in the complaint support a plausible inference that the challenged advertisements in fact misled a significant number of reasonable consumers." *Id.*

9

Every challenged statement is considered "in its entirety and in its 'full context.'" *Id.* (citation omitted).  Kalmbach challenged a variety of Purina's statements, as well as the statements of Purina's retailers.  (ECF No. 67 at 14–15).  These include the following statements characterizing Purina's feed:

- "Defends Against Viruses, Like Bird Flu[.]  Comes with built-in defense against avian influenza and other viruses, giving you peace of mind from the inside out."[4]

- "Complete whole-food goodness with bird flu defense."[5]

- "[G]ive[s] your hens the wellness boost they deserve with layer feed that nourishes AND defends:  [f]ortifies immunity and helps defend against bird flu[,] [g]ut health support[,] [s]trong shells, vibrant yolks."[6]

- "Fun-filled, flu-fighting goodness?  Yep, it's a thing. . . . Whole grains, vibrant ingredients and defense against bird flu?  That's a win for your hens *and* your peace of mind."[7]

- "[H]as been shown to be effective against, protecting against viruses, which includes bird flu in that."[8]

Kalmbach argues that the challenged statements are literally false or false by necessary implication, but even if they are only misleading, they actually deceived customers and therefore form a basis for injunctive relief.  (ECF No. 67 at 19–23.).

Purina instead argues that its statements are really about FeedLock protecting the feed, pointing out that several of these statements "include[] explicit language connecting the viral defense benefits to the feed."  (ECF No. 68 at 8 (citing Pl.'s Exs. 1-F, 1-G, and 11-D)).  But Purina's

---

[4] Pl.'s Ex. 1-A; *see* Pl.'s Exs. 1-B, 1-G.
[5] Pl.'s Ex. 1-C.
[6] Pl.'s Ex. 1-E.
[7] Pl.'s Ex. 2-B; *accord* Pl.'s Exs. 1-F, 1-I; 1-N.
[8] Pl.'s Ex. 11-D; *accord* Pl.'s Ex. 1-H; *see* Reiterman Feed & Supply video, n.3, *supra*.

arguments are unavailing, and its examples undermine its argument that it advertised FeedLock as protecting feed, and not birds.

As a threshold matter, Purina's claims appear to be scientifically dubious. Purina does not link chicken feed to the transmission of avian influenza in birds. Although Purina has a laboratory test suggesting that FeedLock could lower the amount of infective avian influenza in contaminated feed, that test does not show that it would impact the risk of chickens contracting avian influenza. In fact, the consensus is that chicken feed is not known to be a vehicle for avian influenza in birds. Purina points to research that shows feed can be a source of transmission for viruses in swine, and FeedLock's mechanism could defend against those viruses. But that is irrelevant. Swine feed is known as a vehicle of infection for those particular envelope viruses in swine, but those swine viruses do not impact birds, and chicken feed is not a known vehicle of transmission.

Thus, Kalmbach is likely to succeed on the merits of its claim that Purina's statements regarding the impact of its FeedLock feed on avian influenza are literally false.

### a. Purina Made Explicitly False Statements Regarding "Immunity."

Literally false messages can be explicit. *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 735–36 (6th Cir. 2012). Plaintiff makes explicitly false statements regarding the immunogenic benefits of Farm to Flock. In Plaintiff's Exhibit 1-F, for instance, Purina touts the feed's "Complete . . . Defense for Laying Hens" and "Fun-filled, flu-fighting goodness" in large font at the top of the advertisement, while its supposed caveat explaining that this defense relates to the feed is found in small font at the bottom. (Pl.'s Ex. 1-F). That caveat states that "FeedLock® is a breakthrough ingredient of the system that nourishes and protects, *helping to instantly defend your flock against avian influenza, while also boosting immunity and breaking down harmful pathogens on the feed* with every bite." (Pl.'s Ex. 1-F) (emphasis added). This language is critical.

11

Purina makes claims *both* about FeedLock's interaction with avian influenza on feed, where FeedLock supposedly would break down pathogens, and with avian influenza in a bird, where FeedLock would supposedly boost immunity. Thus, Purina *explicitly distinguished* FeedLock's purported benefits in defending the chicken flock from avian influenza from its purported benefits in breaking down pathogens on the feed. For instance, in Plaintiff's Exhibit 1-G—which discusses FeedLock's impact on the feed—Purina stated that "FeedLock® . . . helps to support strong healthy hens by *actively supporting and fortifying immunity* and gut health." (Pl.'s Ex. 1-G) (emphasis added).

Purina's expert witness, Dr. Crowder, testified that it was "improper" to represent that FeedLock provides any "immunity or treatment against avian influenza." (Tr. vol. 4, 631–32). According to her, FeedLock's "*only* protection" among those that Purina claims would be in how it interacts with the virus on feed; FeedLock "does not provide any additional protection to the bird." (Tr. vol. 4, 690). And Kalmbach's expert witness Dr. Shane agreed. He testified that FeedLock "isn't immunogenic in any way." (Tr. vol. 2, 220). But Purina advertised Farm to Flock as providing immunogenic benefits. Purina's statements regarding these immunogenic benefits appear to be actually false.

### b. Purina Made Explicitly False Statements Regarding the Purported Defense Offered By FeedLock.

Both parties' experts agreed that, at a minimum, feed is not recognized as a "transmission vector of bird flu." (Tr. vol. 3, 592–93; *see also* ECF No. 67 at 14). This is fatal to Purina's more ambitious statements that FeedLock defends against the bird flu, apart from any immunogenic function. (*E.g.*, Pl.'s Ex. 11-D[9] (during his webinar, Dr. Biggs claimed Purina's feed would "help protect those birds and *kind of eliminate one source of contamination* . . . and make them as safe

---

[9] *See* Reiterman Feed & Supply video, n.3, *supra*.

as possible") (emphasis added)). If feed is not a known transmission vector—and Purina's laboratory test does not show that it is—protecting the feed could have no impact on whether birds would get avian influenza.

Purina's expert, Dr. Crowder, testified that there is no study showing that chicken feed is a vector of transmission of the bird flu, (Tr. vol. 3, 592–93), which aligned with the testimony of Kalmbach's expert, (Tr. vol. 2, 212, 218) (testifying that feed "is not a normal or acknowledged vehicle of infection"). Dr. Crowder could only say that "[FeedLock] would definitely be able to interact with that virus and break down the viral envelope," which would then reduce the infectivity of the virus to some extent—she would not say that it could "neutralize" the virus. (Tr. vol. 3, 594–95). Reduced infectivity does *not* mean *noninfective*: indeed, Dr. Crowder testified that Purina's laboratory test only showed that, in the lab, infected feed was "approaching nondetectable or approaching noninfective" once treated with FeedLock. (Tr. vol. 3, 573–74). Purina had no evidence showing Purina feed infected with avian influenza, once treated with FeedLock, ever had a nondetectable or noninfective amount of avian influenza. And the feed Purina subjected to testing was poultry mash feed—a ground feed different than Farm to Flock. (Tr. vol. 4, 658–59).

As Dr. Crowder herself conceded, "the *only* tool right now . . . to combat bird flu would be biosecurity measures. And [biosecurity measures] would be . . . anything that potentially *reduces the risk of coming into contact with contaminated surfaces*." (Tr. vol. 3, 561–62) (emphasis added). FeedLock feed treated with avian influenza was "approaching noninfective": put another way, it was still infective. (Tr. vol. 3, 573–74). Certainly, then, Purina's feed with FeedLock would still be a "contaminated" surface if it came into contact with avian influenza, and Purina never suggested that the presence of FeedLock in the feed would change the risk that a bird would come into contact with the feed itself. Thus, Purina's more ambitious suggestions that FeedLock would

defend backyard chicken flocks against avian influenza appear to be literally false. FeedLock may well be "a promising disinfectant," (Tr. vol. 3, 576), but Purina's advertisements appear false because there is no evidence establishing that FeedLock in fact defends against avian influenza. *See Church & Dwight Co. v. Clorox Co.*, 840 F. Supp. 2d 717, 722–23 (S.D.N.Y. 2012).

### c. Purina Also Necessarily Implied False Statements Regarding the Ability of FeedLock to "Defend Against" Bird Flu.

Purina did not only make explicitly false statements regarding the purported defense of FeedLock. It also necessarily implied false statements. Literally false messages can be "conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Innovation Ventures*, 694 F.3d at 735–36 (citation and internal quotation marks omitted). In this case, Purina's advertising claims must be read in context.

For instance, Purina claimed that "FeedLock® ingredient helps defend your flock. . . . It helps to support strong healthy hens *by actively supporting and fortifying immunity* and gut health" must be read with Purina's claim in that same ad that "FeedLock® . . . *helps defend your flock against avian influenza* and other viruses." (Pl.'s Ex. 1-G (emphasis added)).

Second, Purina's claim that its feed "[c]omes with [a] built-in defense against avian influenza" must be read in context with its claim in the same ad that it "giv[es] you peace of mind from the inside out." Pl.'s Ex. 1-A.

Third, Purina claimed that its feed "give[s] your hens the wellness boost they deserve with layer feed that nourishes AND defends: [f]ortifies immunity and *helps defend against bird flu*[,] [g]ut health support[,] [s]trong shells, vibrant yolks." (Pl.'s Ex. 1-E) (emphasis added). This claim necessarily implied that the feed helps defend *the chicken* against bird flu *after consumption*—not just the feed. The overarching claim is that the feed gives the hens a wellness boost. Every other

14

claim in the ad (that the feed nourishes, fortifies immunity, supports gut health, leads to stronger shells and vibrant yolks) suggests a benefit to the *hen*, not the feed.

Even assuming *arguendo*, as Purina suggests, that the bird flu defense claim is about the feed and thus is not itself explicitly false, it is false by necessary implication. Purina cannot be heard to claim that this one statement, buried among six about how Purina feed benefits the health of hens, is about a benefit to the feed itself. It cannot be heard to say that any claim that its feed fortifies immunity is unrelated to a claim that the feed defends against viruses. And it cannot be heard to claim that its claims of a built-in defense are about the feed when it promises its customers "peace of mind." Purina simply does not offer any "reasonable interpretation." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007). Each time, "[t]he context makes clear" to the reader that Purina's claims about bird flu defense pertain to the chicken, not the feed. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 243–44 (2008) (Breyer, J., dissenting).

Similarly, other ads suggest that the more FeedLock feed a bird consumes, the stronger its immunity becomes: "FeedLock® . . . help[s] to *instantly defend* your flock against avian influenza, while also *boosting immunity . . . with every bite*." (Pl.'s Ex. 1-F) (emphasis added).

The necessary implications from all these statements are twofold. First, distinct from the facial immunity claim, *see* Section III(B)(1)(a), *supra*, some of these ads plainly and facially imply that FeedLock feed is defending or mitigating avian influenza *in the chickens themselves* by "boosting immunity." Letters and inquiries from Purina's regulators confirm this implication. The Kansas Department of Agriculture contacted Purina about Farm to Flock on May 16, 2025, writing that "[t]he claim 'comes with built-in defense against avian influenza and other viruses giving you peace of mind from the inside out' *implies this product can be used to treat or prevent a disease*," and would need to be removed from Purina's website—along with the claim that the feed "Defends

Against Viruses, Like Bird Flu." (Pl.'s Ex. 4-B) (emphasis added). On May 30, 2025, Purina acknowledged to regulators at the Minnesota Department of Agriculture that certain of Purina's statements regarding Farm to Flock—specifically, that it "[c]omes with built-in defense against avian influenza and other viruses," and that it "Defends Against Viruses, Like Bird Flu" had implied to those regulators that "*the product may be used to treat or prevent disease*." (Pl.'s Ex. 4-D) (emphasis added). In early July, Defendant Purina's expert witness, Dr. Crowder, participated in a call with the Food and Drug Administration, where Purina was asked to ensure "one statement . . . had been edited or removed." (Tr. vol. 4, 611–12). According to Dr. Crowder, the FDA took issue with advertising statements about the bird flu that lacked "explicit reference to the feed itself." (Tr. vol. 4, 636).

Second, the ads imply that FeedLock defends backyard chickens more when more feed is consumed, and continue to defend chickens even after consumption—*i.e.*, by offering continuing immunogenic and health benefits to the birds "with every bite." *Cf. Int'l Code Council, Inc. v. UpCodes, Inc.*, 43 F.4th 46, 57–58 (2d Cir. 2022) (statements that UpCodes "hosts the adopted codes *as enacted* by the state or local jurisdiction . . . necessarily imply that UpCode integrates *all* local amendments made in those jurisdictions"). As already discussed, FeedLock likely does not have an immunogenic benefit. *See* Section III(B)(1)(a), *supra*. It does not help a chicken defend against avian influenza after consumption. Here, the combination of immunity and health claims in combination with claims that FeedLock feed "defends against" avian influenza and other viruses necessarily implies that FeedLock is providing some antiviral value to the bird itself, including *after* consumption. Based on the record, this appears to be false.

### d. Purina Necessarily Implied False Statements Regarding "Other Viruses."

Next, the Court considers the claim in many of the challenged ads that Farm to Flock, by virtue of containing FeedLock will defend against "other viruses." (*E.g.*, Pl.'s Ex. 1-A). Purina's statements that FeedLock feed defends against virus*es* plural, such as avian influenza and "other viruses," necessarily and unambiguously implies, in the context of an advertisement for "Hen Food," that there are other viruses that FeedLock defends against. (*Id.*).

But this appears to be false. Purina's Dr. Crowder testified that even though Purina advertised FeedLock as defending "against avian influenza and other viruses," she could not identify any other virus "that would infect birds." (Tr. vol. 4, 628–29). Evidently, no other viruses would threaten birds consuming Purina's Farm to Flock feed. Avian influenza is the only virus known to infect birds. Yet some of Purina's statements necessarily imply the apparently false message that FeedLock provides some benefit to backyard chickens by defending against other viruses that threaten birds.

In sum, Purina appears to have made a series of literally or impliedly false statements. Because the Court concludes that Kalmbach has shown a strong likelihood of success in establishing the falsity of Purina's statements, however, it need not consider, at this preliminary stage, whether Purina's statements were also of a misleading nature.

### 2. Deception

Second, Plaintiff must consider each statement at issue and show that the statement actually deceived or tended to deceive a substantial portion of the message's intended audience. *FedEx*, 97 F.4th at 453. Courts presume that actually false statements deceived their audiences, whereas misleading statements must actually—or at the motion to dismiss stage, at least plausibly—deceive a significant portion of reasonable consumers.

In this case, Purina appears to have made numerous statements that were literally false. *See* Section III(B)(1), *supra*. Thus, "[a]ctual deception is presumed." *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999). For the purposes of a preliminary injunction, Kalmbach has met this element.

### 3. Materiality

Third, Plaintiff must show that the statement likely influenced the intended audience's purchasing decisions. *FedEx*, 97 F.4th at 453. Kalmbach has sufficiently established this materiality for purposes of a preliminary injunction in two distinct ways: by showing some evidence of customer confusion; and by showing that Purina's statements concerned an inherent quality or characteristic of the Farm to Flock feed. The Court considers in turn below customer confusion and Purina's statements regarding an inherent quality or characteristic.

### a. Customer Confusion

Customer inquiries are sufficient "as proof of the likelihood of damage[] and may suffice to show that the deception was material and likely to influence a purchasing decision." *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 696 (6th Cir. 2000) (citation omitted). One of Kalmbach's sales representatives testified that she was told by customers and potential customers that they wouldn't consider Kalmbach's Henhouse Reserve feed because it lacked a bird flu preventative or bird flu prevention, unlike Purina's Farm to Flock. (Tr. vol. 2, 268, 272–73, 275–87, 299).

This Court considers these calls to the extent they evidence customer confusion, which they clearly do. (*E.g.*, Tr. vol. 2, 276 ("[A customer] just asked me why Henhouse didn't have it in there, and if it was even possible to put bird flu prevention in a chicken feed. And I told him no. . . . Just him trying to understand why it would be marketed if it wasn't possible to put it in the

18

feed."); Tr. vol. 2, 277–78; ("[A customer] also brought up the fact that Farm to Flock had the bird flu preventative in it, also asked how it was possible or if it was possible, to which I told him no, it wasn't, and [he] asked why it would be in Purina advertising if it was false. . . . I told him I wasn't sure why they were advertising it if it wasn't true.")).

Testimony offered to demonstrate customer confusion is "not offered for 'the truth of the matter asserted,' but rather [is] 'probative of the declarant's confusion,'" and is admissible. *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 589 (6th Cir. 2015) (citations omitted); Fed. R. Evid. 801(c)(2); *see id.* 803(3) (allowing "[a] statement of the declarant's then-existing state of mind"). "[S]trict application of the rules of evidence to a claim that depends on showing customer confusion places too heavy a burden," and it would be absurd to "expect a sworn statement or affidavit from a retailer who calls into a distributor and claims to have been confused[.]" *Innovation Ventures*, 694 F.3d at 738. Testimony regarding customer calls can be "introduced merely to show that the conversations occurred and the state of mind of the declarants." *Id.*; *accord Idaho Golf Partners, Inc. v. Timberstone Mgmt., LLC*, 2016 WL 4974944, at *2 (D. Idaho Sept. 16, 2016) (holding "statements demonstrating [customer] confusion are not hearsay because they are not offered for their truth").

This customer confusion comparing Kalmbach's Henhouse Reserve to Purina's Farm to Flock strongly suggests at this preliminary stage that at least some customers would have purchased Kalmbach's feed rather than Purina's "had it not been for the false or misleading statements of the defendant." *Medison Am., Inc. v. Preferred Med. Sys., LLC*, 548 F. Supp. 2d 567, 582 (W.D. Tenn. 2007), *aff'd*, 357 F. App'x 656 (6th Cir. 2009); *La.-Pac. Corp. v. James Hardie Bldg. Prods. Inc.*, 2018 WL 7272047, at *7 (M.D. Tenn. Dec. 20, 2018) (finding a likelihood of success in demonstrating materiality from evidence showing actual deception);

*compare IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 376 (5th Cir. 2002) (finding plaintiff "failed to produce competent summary judgment evidence . . . that indicates that customers would have bought [plaintiff's] products instead of [defendants'] in the absence of defendants' allegedly false and misleading statements").

### b. Inherent Quality

Moreover, at this stage, Kalmbach has sufficiently shown that Purina "misrepresented an inherent quality or characteristic of the product." *Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002) (citing *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997)); *accord Mahindra & Mahindra Ltd. v. FCA US LLC*, 2021 WL 323253, at *8 (E.D. Mich. 2021); *see* Section III(B)(1), *supra*. This can be sufficient to show materiality. *In-N-Out Burgers v. Smashburger IP Holder LLC*, 2019 WL 1431904, at *7–8 (C.D. Cal. Feb. 6, 2019) (finding advertising claim material when it involved the "inherent quality or characteristic" of the product). This is because "[c]onsumers rely on perceived value in deciding which products to purchase." *Id.* at 7. Advertising suggesting that chicken feed "*defends against viruses, like the bird flu*" is likely to induce consumers to believe they are getting a better product than feed that does not offer such a defense. Such advertising "is thus material in that it is likely to affect consumers' purchasing decisions." *Id.* Purina does not address the fact that its advertising concerned the inherent nature of its feed. (*See* ECF Nos. 66 at 23–24; 68 at 14).

Kalmbach has presented evidence that Purina's claims of bird flu defense in its feed are material to customers. Purina's own internal consumer research results concluded that such claims were "most motivating" to customers. (ECF No. 67 at 4 (citing Pl.'s Ex. 3-A)). One of Kalmbach's experts, Dr. Mitchell, testified that many consumers in this market are more emotionally motivated to keep their chickens alive, and are concerned by recent outbreaks of avian

influenza. (Tr. vol. 3, 362, 364). Purina's expert Dr. Kees agreed that backyard owners "are emotionally connected to their flock." (Tr. vol. 4, 723). Dr. Mitchell testified that for backyard chicken owners, due to "the salience and importance of trying to protect their birds from avian flu, if a product made a claim that . . . birds are not going to get avian flu . . . or they're going to be less likely to get avian flu," those owners would be motivated to purchase it. (Tr. vol. 3, 383). Similarly, Purina's senior marketing manager testified that Purina's consumers "started to humanize or personify their chickens, and so they treated them like family. They were more like pets like cats and dogs." (Tr. vol. 3, 464; ECF No. 59 at 114). Like many pet owners, backyard chicken owners emotionally fear for the wellbeing of their birds.[10] They were probably inclined to gravitate towards and rely upon Purina's avian influenza advertising.[11]

Based on this record, the Court finds that Kalmbach has satisfied materiality for the purposes of a preliminary injunction. In considering materiality, the Court must assume the perspective of the consumers in question, *Mahindra*, 2021 WL 323253, at *8, and in this case, it

---

[10] This fear of pet owner for his pet's well-being is not new; it is ancient. Procopius of Caesarea, a historian living in the sixth century, wrote of the Western Roman Emperor Honorius' fondness of a pet chicken he had named Rome, after the eternal city. Apocryphally, Emperor Honorius was first informed in 410 AD that Rome had perished, he cried out in dismay, believing that his beloved bird had died. In fact, the Visigoths, a barbarian tribe, had sacked the city of Rome. The emperor was relieved, stating "But I, my good fellow, thought that my fowl Rome had perished." Procopius, 2 History of the Wars, 17 (H.B. Dewing ed. & trans., 1916).

[11] The Court is persuaded in part by a Purina internal report finding that the vast majority of consumers in the market found "brands that spend time educating customers are more trustworthy," and thought it was "important to stay up to date on the latest nutrition for animals." (Tr. vol. 4, 724–25). The Court disagreed with Dr. Kees' conclusion, however, that it follows from this report that "this would be a population . . . that would be more likely to scrutinize advertising and advertising claims." (*Id.*). If anything, it seems logical that consumers would be *less* inclined to scrutinize Purina's claims because they would *trust* Purina, believing that Purina's efforts to educate consumers as to their feed's purported benefits were based on the latest updates in animal nutrition. This explanation aligns with the customer confusion testimony of Kalmbach's sales rep, *see* Section III(B)(3)(a), *supra*, which suggested that consumers may have assumed that Purina would not advertise the purported bird flu defense benefits of Farm to Flock if they were not true.

appears that the backyard consumers are concerned about the health and well-being of their flocks and would be motivated to purchase a feed that protects them from a devastating virus. Kalmbach has successfully shown at this stage that bird flu defense, "as a[n] [inherent] characteristic, is material to consumers." *Method Pharms., LLC v. H2-Pharma, LLC*, 2025 WL 2298395, at *5 (M.D. Ala. Aug. 8, 2025); *In-N-Out Burgers*, 2019 WL 1431904, at *7.

### 4. Interstate Commerce

Fourth, under the Lanham Act, Plaintiff must show that the statements were introduced into interstate commerce. *FedEx*, 97 F.4th at 453. Plaintiff appears to have made that showing. Defendants concede that Purina conducted extensive advertising including through "digital ads," "web content," "social media," and "email," and note that the advertising claims drew regulatory attention in three separate states. (ECF No. 66 at 1, 16). Sending emails "creates the interstate commerce nexus," *Grubbs*, 807 F.3d at 803, as does publishing statements on the internet. *Gathering Spot, LLC v. Gathering Spot at Burlington Village LLC*, 2023 WL 11897502, at *4 (E.D. Tenn. Aug. 29, 2023); *Advance Dx, Inc. v. YourBio Health, Inc.*, 753 F. Supp.3d 53, 67–68 (D. Mass. 2024) (collecting cases).

Regardless, as Plaintiff points out, Defendants do not contest that the advertisements were placed into interstate commerce. (ECF No. 69 at 13; *see* ECF No. 66 at 4–17, ECF No. 68 at 13–15). Therefore, the Lanham Act's fourth element is also satisfied. For jurisdictional reasons, no analogous requirement exists under the Ohio Deceptive Trade Practices Act.

### 5. Causation

Fifth and finally, Plaintiff must show a causal connection between the statement and the injury. *FedEx*, 97 F.4th at 453. The causation standard in a false advertising claim is a proximate causation standard, meaning that the Lanham Act "generally bars suits for alleged harm that is 'too

remote' from the defendant's unlawful conduct." *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 411–12 (6th Cir. 2024) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)). Consumer deception is not fatal; rather, a plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought be the defendant's advertising," which "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.*

"[T]o obtain injunctive relief[,] logical likelihood of damages is sufficient." *La.-Pac. Corp.*, 2018 WL 7272047, at *8; *Mahindra*, 2021 WL 323253, at *8. In this case, there is "a legal presumption of consumer deception for a competitor's literally false advertisements." *Innovation Ventures*, 529 F. App'x at 569. And the Sixth Circuit has clarified that it "do[es] not require distinct evidence of harm as a prerequisite for injunctive relief." *Id.* at 568.

In light of that presumption, the question is whether Kalmbach has presented some evidence "'demonstrating that consumers were misled.'" *Id.* at 568 (quoting *Am. Council*, 185 F.3d at 618). It has. Kalmbach's CEO testified that Kalmbach has received inquiries asking why Kalmbach does not "have a product like [Purina's] that can defend against bird flu," (Tr. vol. 1, 77), and one of Kalmbach's sales representatives testified that customers asked why Kalmbach's Henhouse Reserve lacked bird flu protection, unlike Purina's Farm to Flock, *see* Section III(B)(3), *supra*.

"[T]he 'more immediate victim[s]' of false advertising in any given case can satisfy the causation requirement." *Campfield*, 91 F.4th at 412 (quoting *Lexmark*, 572 U.S. at 140). This Court finds that, for the purposes of a preliminary injunction, Kalmbach was and is an immediate victim of Purina's false advertising, and has sufficiently demonstrated that its customers were misled. Therefore, the Lanham Act's fifth element is satisfied.

### C. Irreparable Injury

Section 1116 vests district courts with the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, . . . to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." 15 U.S.C. § 1116(a). "A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for [such] a violation . . . in the case of a motion for a preliminary injunction or temporary restraining order." *Id.*

### 1. Presumption of Irreparable Harm and Nature of Injury

Because the Court has concluded that Kalmbach has shown a likelihood of success on the merits, a rebuttable presumption of harm applies, as Kalmbach points out. (ECF No. 69 at 15).

Purina argues that the presumption in this case is a weak one, "rebutted by the record evidence showing an at-most *de minimis* and exclusively economic injury." (ECF No. 66 at 26; *accord* ECF No. 68 at 15). According to Purina, any lost sales could be recouped by money damages, and there is no evidence supporting "a more severe and ongoing injury," like a dealer dropping Kalmbach for Purina or reputational damage. (ECF No. 66 at 26; *see* ECF No. 68 at 15). Purina also argues that an advertising retraction would be too extreme here, where there is no ongoing, irreparable injury. (ECF No. 66 at 27). For its part, Kalmbach argues that the nature of its losses, as a direct competitor to Purina, would make it difficult to calculate damages. (ECF No. 67 at 27; *accord* ECF No. 69 at 15). Last, Kalmbach argues that the deception of its customers is presumed in light of Purina's literally false advertising statements. (ECF No. 69 at 15).

This Court finds that the presumption of harm has not been overcome—rather, Kalmbach has shown that there is still the distinct possibility that it will suffer injury. Both Kalmbach and Purina are competitors in the area of backyard feed, and both offer a similar, textured, granola

feed.  Thus, there is some causal connection between Purina's advertising and Kalmbach's sales. *Chobani, LLC v. Dannon Co.*, 157 F. Supp. 3d 190, 205 (N.D.N.Y. 2016); *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011).  Crucially, although Purina sent out three blast emails to 130,000 recipients about Farm to Flock with statements regarding avian influenza, (Tr. vol. 3, 507–08), it has never corrected those emails, (ECF No. 67 at 16).  Should any of those 130,000 email recipients (or any further recipients of those emails) rely on those emails, further disseminate those emails, or refer back to those emails today or in the future, they may believe Purina still represents that its Farm to Flock feed helps defend against bird flu. Because it would be difficult, if not impossible, to calculate whether Purina's more recent sales of Farm to Flock were a result of these latent advertisements, calculating damages would be futile. *Chobani, LLC*, 157 F. Supp. 3d at 204.  Any injury thus would be "hard to quantify or unwind." *Student Res. Ctr. v. E. Gateway Cmty. Coll.*, 2022 WL 2666730, at *8 (S.D. Ohio July 11, 2022) (Marbley, J.).  Despite its argument to the contrary, Purina's "take down efforts" have not yet been "comprehensive."  (ECF No. 66 at 16).  Thus, because there is a presumption of harm, likely ongoing harm, and a "realistic prospect of harm in the immediate future," *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 280 (6th Cir. 2015), "there is no adequate remedy at law" and an injunction is appropriate.  *Profusion Indus., LLC v. Chem-Tek Sys., Inc.*, 2016 WL  7178731, at *7 (N.D. Ohio Dec. 9, 2016).

## 2.  Delay

Separately, Purina argues that Kalmbach's supposed delay in bringing the motion undermines any claim of irreparable harm.  (ECF No. 66 at 26–27).  Kalmbach challenges this, arguing that it did not delay in seeking injunctive relief.  (ECF No. 69 at 16).  This Court agrees with Kalmbach.  In considering whether a delay justifies denial of a preliminary injunction, it is

the "unreasonable delay" which "will weigh against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013); *see, e.g.*, *Manlove v. Volkswagen Aktiengesellschaft*, 2019 WL 2291894, at *15 (E.D. Tenn. May 17, 2019) (finding a 17-month delay weighs against irreparable harm); *Kenyatta v. Combs*, 2025 WL 2636610, at *10 (S.D.N.Y. Sept. 12, 2025) (finding a delay of 8 months from filing action and 3 months from amending complaint undermined irreparable injury). By contrast, "a delay caused by plaintiff's good faith efforts to investigate . . . does not preclude a finding of irreparable harm." *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 264 (3d Cir. 2000) (citations and internal quotation marks omitted).

In this case, Plaintiff's learning about Purina's advertisements in April and bringing suit in early June is not a sufficient delay to undermine Kalmbach's claim of irreparable injury, especially given "the significance and the complexity of the issues." *Caspar v. Snyder*, 77 F. Supp. 3d 616, 640–41 (E.D. Mich. 2015) (finding a 68-day delay to file a preliminary injunction motion does not weigh against irreparable harm); *Young v. Lumenis*, 301 F. Supp. 2d 765, 772 (S.D. Ohio 2004) (Marbley, J.) (finding 6-month delay to file complaint and subsequent 2-month delay to seek preliminary injunction "was not so substantial as to foreclose . . . preliminary injunctive relief"); *see also AtriCure, Inc. v. Meng*, 2020 WL 13613236, at *9–10 (S.D. Ohio Feb. 3, 2020) (collecting cases). Given the fact that Plaintiff would need some time to evaluate the scientific nature of Purina's advertisements, this minimal delay can be explained as the result of necessary diligence. (*Cf.* ECF No. 69 at 16).

### D. Harm to Others

The third factor of a preliminary injunction weighs the impact of a preliminary injunction on others. *See S. Glazer's Distribs.*, 860 F.3d at 849. The Lanham Act grants district courts the

"power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent . . . a violation." 15 U.S.C. § 1116(a). This power includes enjoining a party from disseminating statements that are likely to be proven false, as well as directing a party to issue corrective statements to remedy the effects of advertising that has already reached consumers. *E.g.*, *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 264 (4th Cir. 2017).

Purina has taken steps to eliminate the further publication of materials with false statements, but it has not taken any steps to correct the false statements. *Compare Eastman Chem. Co. v. PlastiPure, Inc.*, 969 F. Supp. 2d 756, 771 (W.D. Tex. Aug. 30, 2013) (corrective advertising not warranted where defendant had already engaged in significant corrective advertising). Kalmbach argues that Purina "has no equitable interest in perpetuating false claims about its products," and Purina essentially brought upon itself any injury it might suffer from Kalmbach's equitable relief. (ECF No. 67 at 28). Purina argues that a public retraction would risk damaging its reputation. It points out that a court order proclaiming its ads were "unsupported and untrue" would erode brand trust and goodwill and would be inappropriate at this stage. (ECF No. 66 at 27–29). To a certain extent, this was a self-imposed risk that Purina took when it began its ad campaign. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (citation and internal quotation marks omitted); *cf. ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 504–05 (6th Cir. 2022).

This Court finds that the balance of the equities supports a preliminary injunction, and a retraction.

### E. Public Interest

The fourth and final factor of a preliminary injunction weighs whether the issuance of a preliminary injunction would be in the public interest. *See S. Glazer's Distribs.*, 860 F.3d at 849. There is a public interest in preventing misleading advertisements. *MicroStar Logistics, LLC v. Cavalier Distrib. Co.*, 2025 WL 815385, at *7 (S.D. Ohio Mar. 14, 2025); *Novartis*, 290 F.3d at 597; *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1321 (11th Cir. 2010) (noting the public interest in "preventing customer confusion or deception"). That public interest also extends to ensuring false information is corrected. *Handsome Brook Farm, LLC*, 700 F. App'x at 265. Thus, this Court also finds that the public interest supports a preliminary injunction.

### F. Relief Sought

Purina initially consented to a preliminary injunction. It proposed that the Court issue a preliminary injunction that would enjoin it from advertising that its products help defend against avian influenza and notify distributors, retailers, and marketing affiliates to cease use and dissemination of such advertising. (ECF No. 24-1 at 1). Kalmbach argued that Purina's proposed injunction was an insufficient remedy. Beyond merely enjoining Purina from further advertising that its products help defend against bird flu, Kalmbach asks this Court to order Purina to publish on its website, social media pages, and other digital platforms the following Statement:

> Pursuant to an Order of the U.S. District Court for the Southern District of Ohio dated _____, 2025, Purina hereby gives notice that it previously advertised Farm to Flock 18% Layer Hen Food as having a 'built-in defense against avian influenza,' 'Defend[ing] Against Viruses, Like Bird Flu,' and 'helping defend against viruses like bird flu.' These statements lacked factual support, are untrue, and Purina retracts them, as well as any other representation that Purina's Farm to Flock 18% Layer Hen Food prevents or mitigates the effects of avian influenza or bird flu.

(ECF No. 67 at 1–2). Kalmbach also asks the Court order Purina to "[n]otify all distributors, retailers and marketing affiliates to cease use or dissemination of the Challenged Advertisements

*and provide each with a copy of the Statement and this Order*" and "[i]ssue the Statement to any other person or entity to whom Purina previously advertised about the bird flu defensive properties of its bird feed. (*Id.* at 2) (emphasis added).

Purina argues that a mandatory preliminary injunction here in the form of a retraction would be "outsized and unwarranted" based on the record. (ECF No. 68 at 16). Purina argues that the record does not show that Kalmbach would suffer an irreparable injury absent a retraction, but Purina would "in the form of spillover risk and broader reputational harm." (*Id.*). Purina also challenges a retraction on the grounds that it believes its claims about its feed were "substantiated"—thus, any compelled retraction would mislead its consumers. (*Id.* at 16–17). Purina argues that it showed good faith in already changing its advertising, so Kalmbach's proposed retraction would be a solution searching for a problem, and would instead serve to shame Purina on its own website. (*Id.* at 17). Purina's argument is mainly that requiring any public statement on Purina's part would be too extreme, and Purina points to cases where courts ordered much more tailored relief. (*Id.* at 17–18).

The logic of those cases, however, suggest that retractions should be issued in instances where identifiable third parties received the challenged claim. *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 576 (E.D. Va. 2016) (ordering a "corrective email" to be sent following an email at issue, but finding "no reason to utilize [defendant's] website to fashion on injunctive remedy" where the "website was not used to distribute or publish the false or misleading information"); *accord Handsome Brook Farm, LLC*, 700 F. App'x at 264 ("refusing to further disseminate the email reduces the speed by which the false information spreads, but provides no remedy for those who have already read the email and those who share the email with others").

To date, Purina's corrective efforts have been inadequate because they do not address the misleading and false information that was disseminated to via discrete emails. *Nantucket Wine & Food Festival, LLC v. Gordon Cos.*, 759 F. Supp. 3d 259, 281 (D. Mass. 2024). Just because Purina has addressed some forms of its prior advertisements does not mean that all confusion will have dissipated. *Id.* at 282. Thus, Purina must issue some form of a retraction. *See Honeywell, Inc. v. Control Sols., Inc.*, 1994 WL 740883, at *4 (N.D. Ohio 1994); *Monster Energy Co. v. Vital Pharms., Inc.*, 2023 WL 2918724, at *13 (C.D. Cal. Apr. 12, 2023) (corrective statement is appropriate to remedy lingering confusion).

That being said, Kalmbach's proposed retraction goes too far. Although Purina has not shown that its feed defends against avian influenza, that does not necessarily mean that its statement is untrue. It is a false statement for the purposes of the Lanham Act and the Ohio Deceptive Trade Practices Act because Purina had no empirical support or basis for it, and the scientific consensus today suggests that it is incorrect. *See Church & Dwight Co.*, 840 F. Supp. 2d at 722–23. At this point, there is no evidence for it. At the same time, Kalmbach's expert testified that it is possible that avian influenza could live on chicken feed, and that if a bird ingested that infected feed, that bird could get avian influenza. (Tr. vol. 2, 222). And Purina's expert testified that it is essentially still an open question as to "whether a virus survives on bird feed." (Tr. vol. 4, 685). Similarly, it is an open question whether FeedLock would have any effect on avian influenza in bird feed, or the population of birds that eat said feed. Therefore, Purina engaged in false advertising when it stated that its feed helped defend against avian influenza because that statement was not scientifically grounded and there was no basis for it. At the same time, however, Kalmbach cannot twist the record to suggest that it has definitively proven that Purina's statements are untrue.

30

Therefore, the Court orders Purina send the following retraction to the 130,000 recipients of Purina's challenged emails and display this text prominently for thirty (30) days on Purina's website:

> Pursuant to an Order of the U.S. District Court for the Southern District of Ohio dated November 12, 2025, Purina hereby gives notice that it previously advertised Farm to Flock 18% Layer Hen Food as having a 'built-in defense against avian influenza,' 'Defend[ing] Against Viruses, Like Bird Flu,' and 'helping defend against viruses like bird flu.' At the preliminary injunction stage, the Court found that Purina engaged in false advertising because these statements were not scientifically grounded and lacked a scientific basis. Purina retracts these statements, as well as any other representation that Purina's Farm to Flock 18% Layer Hen Food defends against, protects against, prevents, mitigates, or provides immunity to the effects of avian influenza, bird flu, or other viruses.

This more modest retraction, targeting the Farm to Flock feed on Purina's website and the 130,000 recipients of Purina's challenged emails, appropriately balances the equities and does not unduly punish Purina at this early stage in litigation.

### G. Bond

Before issuing a preliminary injunction or temporary restraining order, the Court may order the party seeking relief "give[] security in an amount . . . proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Kalmbach proposes this Court set no bond. (ECF No. 67 at 2). Purina requests a high bond of $ 10,000,000 in light of Kalmbach's proposed retraction. (ECF No. 68 at 19–20). The Court's retraction is nowhere near Kalmbach's sweeping and punitive recommendation, so bond shall not be as high as Purina requests. But Purina persuasively argues that the Court should be mindful of Kalmbach's incentive to "heap costs on [its] rival[]" through litigation. *Mead Johnson & Co. v. Abbott Lab'ys*, 201 F.3d 883, 888 (7th Cir. 2000). Their feed competition has spilled over into the court system, (Tr. vol 1, 134–35), and the Court ought not anoint a winner at this preliminary stage.

Based on the record before the Court, and given the Court's ordered retraction, *see* Section III(F), *supra*, the Court concludes that a $ 250,000 bond is appropriate.

## IV.    CONCLUSION

The Court finds that Kalmbach is entitled to preliminary relief.   The Court, therefore, will require Purina to publish a retraction in the form set forth herein.   The retraction is necessary at this preliminary stage to clear up any remaining confusion for the 130,000 recipients of Purina's emails.   Therefore, this Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for a preliminary injunction.

Defendant Purina, its officers, agents, and employees are hereby **ENJOINED** from engaging in disseminating any advertising or promotional materials that claim, explicitly or implicitly, that Purina's products defend against or help defend against avian influenza pending final resolution of this action.   Within 10 days of this Order, Defendant shall (A) cease use of, remove, or disable access to any such advertisements and promotional materials from Defendant's website, social media, and any digital platforms under its control; and (B) notify all distributors, retailers, and marketing affiliates to cease use or dissemination of any such advertisements or promotional materials.

Defendant Purina is **ORDERED** to (A) post the following retraction notice, to be displayed conspicuously and continuously for thirty (30) days in prominent font, on Purina's website where Purina Farm to Flock 18% Layer Hen Food is sold, at the following web addresses: https://www.purinamills.com/chicken-feed/products/detail/purina-farm-to-flock-18-layer-hen-food *and* https://www.purinamills.com/ and must also (B) issue an email bearing the following retraction notice to all 130,000 recipients of the identified prior Farm to Flock marketing emails:

> Pursuant to an Order of the U.S. District Court for the Southern District of Ohio dated November 12, 2025, Purina hereby gives notice that it previously advertised

Farm to Flock 18% Layer Hen Food as having a 'built-in defense against avian influenza,' 'Defend[ing] Against Viruses, Like Bird Flu,' and 'helping defend against viruses like bird flu.' At the preliminary injunction stage, the Court found that Purina engaged in false advertising because these statements were not scientifically grounded and lacked a scientific basis. Purina retracts these statements, as well as any other representation that Purina's Farm to Flock 18% Layer Hen Food defends against, protects against, prevents, mitigates, or provides immunity to the effects of avian influenza, bird flu, or other viruses.

Defendant Purina is **FURTHER ORDERED** to file with the Court and serve on the Plaintiff within thirty (30) days of this order "a report in writing under oath setting forth in detail the manner and form in which [Purina] has complied with the injunction." 15 U.S.C. § 1116(a).

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

Date: **November 12, 2025**